We will call now the case of Somerville v. Fuentes, et al., and we will start with you, Mr. Lynch. Thank you, Your Honor. I can't see my son. Mr. Lynch, you're fading in and out on audio, and we don't see you on video. Yeah. I'm not sure why it was working earlier. I hope our technical difficulties are not contagious. They may be. I'm hooked up, you know, I'm hardwired to our network. I'm not using Wi-Fi or anything like that, so that shouldn't be an issue. I don't know what's going on. So, first, whatever is going on first, or... Well, we can proceed with audio if you're comfortable. If you think this is something you could resolve in a minute or so, we could give you the time to do that before getting started. Okay. I'm seeing, like, a wheel spinning right now, and my screen has gone, like, gray. Can you still hear me? We can still hear you. Okay. And it says, my Zoom meeting is not responding, but yet, at the same time, I can still hear you, and you can still hear me. So, that's odd. Mr. Ledge, are you comfortable proceeding via audio? The other alternative is, in our next case, and come back to you all, if that was acceptable to Mr. Graves as well, we would have this resolved by then. I can proceed with just audio. However, given what's happening with my computer right now, I'm concerned that it's going to Okay. We'll go forward by audio then. Okay. Thank you. All right, Patrick, let's start time now. Restart it if you had previously. Judge Krause, may I reserve two minutes for rebuttal, please? Granted. Thank you. May it please the court. When viewing all the evidence in the light most favorable to plaintiffs, as the district court did here, there was simply no clearly established law in existence on October 8, 2014, that would put every reasonable officer in Detective Sergeant Gregory's shoes on notice that his actions that day violated the Fourth Amendment. Now, there are several factors at play here that such law would need to address and to have had a holding that those factors were insufficient in order to constitute clearly established law. One, and most importantly, is the protracted back and forth of the plaintiffs and their actions that even the district court conceded in its opinion that he could see, that the court could see how an experienced detective would view those actions as, quote, a bit of stage business contrived to justify the continued presence of a lookout for a drug deal. But it's not only that, but the context, the preexisting context in which those actions took place, which were that, one, Gregory knew that Parker was en route to a large drug transaction because he had overheard him agree to that transaction for that specific day where he was being followed. Two, that that individual detoured from the expected path that he was to take to where that large drug transaction was to take place and instead came to this public area, this parking lot. And three, that he specifically chose, despite the presence of other parking spots and other places to go to in that parking lot, a spot that was directly across the driving lane such that he, from Mr. Surly to Mr. Somerville, such that he could observe their every movement via his rear view and side view mirrors. Mr. Lynch, how do we really distinguish that from the VEDA? There, the police officers similarly expressed, you know, their view based on their experience that it was consistent with a criminal act, involvement with a firearm to be shown the firearm, looking at it, talking to the person who had raised it, and nonetheless concluded that that was equally consistent with innocence and it was not sufficient for a reasonable suspicion. Correct, Your Honor. I mean, the lesson from the VEDA was that the reasonable suspicion under Terry must be specific to the person who was detained. And in the VEDA, the mere act of looking at a gun that someone else is in possession of is not, is in no way consistent with actions that could give rise to the belief that someone was engaged in criminality just from the mere fact of looking at a gun. Just looking at someone who had the gun in the backpack, there's no conspiracy to look at a gun statute. And there was no pre-existing, unlike here, there was no pre-existing knowledge that one of those two people was actively engaging in criminality here, trafficking. In the VEDA, the officers were at a spot where a shooting happened maybe months earlier. They were just there on a, just watching everything that was going, happening there. They see the gun-possessing suspect come up to Mr. Noveto and there's nothing to connect him necessarily to the fact that he was then going to necessarily go commit a crime. Whereas here, the actions of the, you know, Mr. Somerville and Sterling would be consistent with conspiracy to engage in drug trafficking if in fact they were acting as counter-surveillance for Mr. Parker. I'm not sure how that's any more so in this case. The only reason that there was potential for viewing it as reasonable suspicion in the case of Noveto was the officer's prior experience. And drawing on that experience, that was an inference that they would make. The only reason that here, you know, you're arguing that there is reasonable suspicion is also taking perfectly innocent activity, viewed objectively, of moving things around in broad daylight in the parking lot of a mall and bringing to it the officer's experience and drawing inferences from that. It isn't the case even stronger in Noveto because at least they spoke with each other and had a closer connection than we have on our facts here. Respectfully, Your Honor, no, it isn't. One, we're talking about not necessarily reasonable, just reasonable suspicion, but also clearly established law, which Noveto is too dissimilar from the facts here to qualify that for this action. But not only that, but no, respectfully, at least in regard to Parker, Gregory has direct knowledge that is more so reflective and that Parker was actively engaged in the act of drug trafficking. He heard him over a phone call agree to travel to Ocean County to engage in a drug transaction. Now, part of the way there about like, you know, prior to him, you know, just getting on the turnpike, but in that direction, he departs and engages in actions that are consistent with, you know, the tactic, the counter surveillance tactic that is known as a cleaning law. Can I just, I'm sorry to interrupt you, but, you know, my thought is what if Somerville and Surly were parked across the street, parked across the lane, but didn't get out of their car, didn't do anything else like that, just sat there. Right. Do you think there would be a reasonable articulable suspicion in that instance, if they were just sitting in their car for the spot? No, I don't, Your Honor, because what gives rise to the suspicion here is that there are specific actions. When Gregory drives past them when he first enters the parking lot, he sees them with a suitcase on the ground in the back of the vehicle, moving things, items in and around inside that suitcase. And then when he gets to his area where he's able to, where he's continuing to observe them, he's seeing them doing this back and forth, back and forth with these individual items. He can't really see what they're doing at the back of the SUV any longer. Hence why he needed to confirm that when they were at the back of the SUV, they were not communicating with Mr. Parker in any way, like visually. But that conduct strikes me as conduct that you might say, hey, this is in anticipation of a drug transaction or something else like this. They've got a suitcase, they're moving things around. But is that really consistent with surveillance? I mean, or counter surveillance? Yeah, it could be, Your Honor, because it would be actions that would justify them being outside their vehicle in an area for a prolonged amount of time, and then also going to an area where they could communicate visually with Parker. When people engage in cleaning runs where they are trying to ascertain whether they're being tailed or not, they can either go to a location and, as Parker did here, sit there and observe around them. Or in this instance, Somerville and Sirleaf were outside of the vehicle and in an area where they were able to look around rather than being just located in the passenger compartment of the SUV that they were in. But I guess my thought is if people are going to do surveillance really, really close across a parking lane from a drug deal, an anticipated drug deal, it seems strange that they would do so with suitcases and moving items around. Like, that almost draws attention as opposed to kind of blends in or is camouflaged as you would think counter surveillance would be. It almost is an increase of movement, an increase of attention, and an increase of almost objects that could be used in conjunction with a drug transaction. Lots of small packages and two big suitcases. And so surveillance, I mean, if the articulable suspicion is these were counter surveillance, wouldn't most counter surveillance be a little bit more surreptitious than this? I don't know, Your Honor. I think, one, the reasonable suspicion standard is so low, below probable cause. It is. But it's reasonable articulable suspicion. And the officers have articulated the suspicion. And the question that we have to ask is, was that articulated suspicion? Because sometimes it's just hunch that's unarticulated. But at least they've done some job, as you argue in your brief, that they've articulated the suspicion. And isn't the preliminary inquiry there, OK, just because you've articulated one, we still have to evaluate the reasonableness of what you've articulated. Because it's reasonable articulable suspicion. That's the essence of surveillance. Correct, Your Honor. Yes. The standard, the guidepost, the north star of the entire analysis for all of this is reasonableness. There's also the additional, those north star and guideposts here, which is clearly established law. And there's simply not been any sufficiently similar, clearly established law that was identified by plaintiffs or by the district court to put an officer like Gregory in that position on notice that the actions of Sirleaf and Somerville at the time, in the context to which they occurred, which is what I described earlier, where this trafficker specifically chose to go to when he was en route to a transaction, that clearly established that that was not reasonable suspicion, rather than whether or not it's just whether or not it would be reasonable if it was being viewed de novo by the court. Mr. Lynch, I had the same, the very same concern. I don't know how this rises to reasonable suspicion. When they're just moving clothing items, and I understand they purchased some medicine for exporting out to their country, but this is in a mall. This is in a mall where it's not that uncommon to open a trunk and to be putting things in and taking things out of a trunk. Why should that amount to reasonable suspicion? And, of course, the other concern I have, of course, is that this entire episode took as much as 90 minutes. One event yielded another, and what you have is an hour and a half detention. But let's go back to the reasonable suspicion. Why should that activity involving the trunk of a car give rise to reasonable suspicion? I agree with your honor that if what they were doing was they had shopping bags and they were putting shopping bags in the back of the SUV or moving those bags from the side to the back in a handful of trips or something like that. But what Gregory first observed... I'm really sorry to interrupt, but why do you agree with Judge Fuentes in that instance? Is there a case that says moving... Because I thought your point was clearly established a lot. Is there a case that says moving shopping bags from the passenger seats to the back seat to the trunk is not reasonable suspicion? Or is that just kind of in the Pelletier case hope that just everyone should know? No, your honor. I'm sorry. When I was answering Judge Fuentes' question, I took it to be him asking a question about the reasonable suspicion, not the clearly established prong of qualified immunity. I'm sorry. I'm sorry to interrupt you. No, no, no. So something like that would potentially be consistent with... I mean, all the actions are consistent with both innocent activity but also suspicious activity because as the court has made clear since Illinois v. Gates, it's not whether or not actually inculpating actions have been observed. It's whether otherwise innocent actions that instead give rise to suspicion that that person is engaged in criminality is the standard. But I think when Gregory first pulled past that spot, what he saw was them with a suitcase on the ground behind the SUV pulling items and moving items in and out and around inside of the suitcase. And that itself is much more peculiar than just like the actions of someone going to a car with shopping bags and moving shopping bags into the car and maybe moving some twice from the side to the back. Here, it was this prolonged back and forth of individual items and back and forth and back and forth and also the suitcase on the ground. So in the context of Parker having pulled right to that specific spot where he could observe them doing this and then... Well, all of this takes place in less than two minutes. And normally, when there's reasonable or sufficient suspicion, there's the opportunity to observe their surveillance for sufficient time and something that we want to encourage in terms of due diligence our law enforcement officers to observe. Here, with the observations of less than two minutes, granted with the time cut short because Parker pulled out of that space, but with a very limited activity, it would be possible to observe for any reasonable officer within that time frame. Is this really anything more than suspicion by proximity? Yes, it is more than suspicion by proximity. It moves it outside of the rule in Ibarra, which is like... Here, unlike in Ibarra where the bar patron did nothing, there was no action that he took himself that would give rise to suspicion in relation to him before he was patted down. Here, there is the peculiarity of the actions of Somerville and Surly and also the specific choice of Parker to go to that specific spot where he could observe them for the entirety of that time. Also, the knowledge that he was, in fact, en route to a substantial drug transaction. We have on this record the officer indicating at an early point in the suit that the suspicion was along the lines that Judge Phipps had indicated seemed common sense that the drugs were in the suitcase and there was going to be a transfer of drugs to Parker. Given the evolution of the articulable suspicion in this case, should that feed into our assessment of how this right is defined and whether that right was clearly established here? Well, so, right. When Gregory first drove past and saw them with the suitcase at the back, he suspected at that point, just based on that observation and the fact that Parker pulled directly across from him, he had a hunch that perhaps they were going to engage in a transaction. But then it evolved when he got to his area of the parking lot where he was taking a survey and he didn't see them approach his car or Parker approach their car. So, it evolved from a potential transaction to him believing that this was a type of cleaning run, a counter surveillance where he was trying to ascertain whether or not he was being surveilled by law enforcement. Can you tell us for both this aspect of the case and also for the scope, which we should turn to, how you would have us define the right at issue? Well, it would have to be that a, you know, someone engaging in trafficking, there's no So, I think it would have to be like those factors. Well, we do, you know, we have said that rights need to be defined with some specificity, but that's even more detailed and specific than probably our most detailed rendition of a right in Spady. If that's the way we articulate the right, of course, because it's the facts differ, there will never be a case that renders it clearly established. I think we probably need something at a higher level of generality than that. Don't we under our case law? I'm not so sure, Your Honor. I think, you know, the Supreme Court has reiterated the levels multiple times over the course of the last few years, the level of specificity needed in order to clearly establish a right. And unlike in other areas, I think, you know, with the availability of suppression motions and the amount of them that occur, this is just like in other areas of a civil case where there isn't going to be cases that have holdings that influence or inform the civil context. Right? So like if, you know, certain areas where qualified immediates apply, there can be an argument that, oh, well, if we just say there's no clearly established law, the contours of the rights will never be defined. Here, we're in an area of the law where there are constantly, you know, motions, press evidence and things of that nature held in the criminal context that can and do inform the scope of the rights and the civil context. So, respectfully, I think that the right at issue would have to be defined with the level of specificity that would be either that or approaching that, something close to what I just laid out in terms of the factors involved. Because the context matters. It's not just the actions of Somerville and Sirleaf at the scene. It's the context in which those actions occur. Would you like to address scope? Sure, Your Honor. In relation to, you know, the scope of the detention, everything through going to the security office to review the security video was then taking steps to either confirm or deny. And, you know, the case is specifically U.S.S. v. Sharpe says it's not whether alternatives existed, that it's whether police acted unreasonably and failing to recognize or pursue them. And here, the mere fact that they took the steps of questioning, then searching, then going to the office to review the video to dispel whether they were acting as lookouts can't be characterized as unreasonable given that they were dealing with this active multi-part crime scene at the time and finite resources in terms of officers. In regard to the 30-minute... What about the fact of keeping them handcuffed for that second half hour after they had been searched, the car had been searched, the officers already had, you know, had called with them, had looked at identification? What is the justification at that point for continuing for an additional 30 minutes to have employees handcuffed? In 30 minutes, are you referring to the time when Gregory went to the security office to review the video? That's right. Well, you know, I don't know that... I don't think that there similarly is clearly established law that they could not do that. It is, you know, there's probably a case law saying that during these types of inquiries that for the purposes of safety and maintaining the safety and order on the scene and the safety of the officers, they can keep individuals who are suspected or who are being questioned and when searches are being conducted, cuffed for the duration of that time period. So that's not clearly established, I think. We're reasonable to protect officer safety, but how is there a need to protect officer safety that would require handcuffs after they've been searched, the car has been searched, and this is... And looking at the videotape, it seems just a confirmation since there's been nothing indicating to that point that they were involved in any drug transaction. Well, respectfully, the... One, there's... I said to a case, I believe it was the Fifth Circuit case, and I'll read those, a recent one, where it was not clearly established that someone who was even just being questioned about a crime where they were, you know, that they had witnessed or that they were witness to, that it was not reasonable for her to be cuffed in the back of a SWAT car for up to 120 minutes in that case, which... So, and respectfully, similarly here, it's not clearly established that they would not be able to keep Somerville and Sirleaf in cuffs until they dispelled, until the investigation into whether or not they were engaged with Parker was unconstitutional. So, I don't think that that's clearly established, similarly to that other case clearly established here. I'm not aware of a case about the Third Circuit of the Supreme Court or a robust consensus of the Courts of Appeals stating that that is clearly established that they cannot do that. But... What about the canine cases? What's that, Your Honor? What about the canine cases and what they indicate about what's expected in terms of due diligence of officers? Well, I don't... The Smith cases, the ones... Both United States v. Place and the ones related to stops that are cited by both the District... I think the District Court and the plaintiffs, I think... I don't know that they're... They're so dissimilar in terms of what they are about that I don't think that they are applicable in the qualified community context to the question here. In Place, they were moving... It was about the movement of luggage from one airport to another with a dog sniff, which took 90 minutes, and then also them holding the suitcase over the weekend before they could apply for a warrant. I just don't think that those cases are applicable, given that they are so factually distinct from the circumstances here, Your Honor. Can you talk to us about the procedural posture here, given that the... We have this on interlocutory appeal, so we're only looking at whether... The scope of the right and whether it was clearly established. But on this issue of scope, the District Court also entered some resistance on the merits. If we affirm as to qualified... The denial of qualified immunity as to scope, is there any reason we would then need to reach the issue of qualified immunity for the initiation of the search, or would the case... That would render the search, given the summary judgment, unconstitutional under the Fourth Amendment? And presumably, at that point, there could be an appeal with a final judgment. I think... That's an interesting question, Your Honor. I think that they were dealt with as distinct rights and distinct analyses by the District Court below. And I think because of what qualified immunity is supposed to be, which is supposed to be a... Not just an immunity to liability, but an immunity to suit, I think that if, for instance, you were not to reverse on the scope, as you were just suggesting in your hypothetical, but that the court would still need to reach the initial detention issue, because that would affect the scope of subsequent trial and Detective Sergeant Gregory's rights in relation to the trial and his burden at trial, that qualified immunity seeks to prevent some of the interests that... From the process and from the trial, not just from liability. So I think that even if, in the circumstances that you're putting forth there, I think still the initial stop would need to be analyzed and dealt with under qualified immunity for potential reasons. And perhaps there'd be a difference in damages, but that's something Mr. Graves can address with us as well. Do my colleagues have other questions? Yeah. I have just one follow up. I have a concern about the holding up of the plaintiff in this case because of the need to do that surveillance or check a surveillance tape. So regarding the scope of the detention, doesn't it seem like a review of the surveillance footage was even necessary? Gregory conducted his own firsthand surveillance and the vehicle had been searched and nothing suspicious had been recovered. So how is this an appropriate extension of the detention? Because Gregory did not observe... His vantage point when he was observing their actions in real time was such that he couldn't see what they were doing at the times that they were behind the SUV, whereas the back hatch was open. So in order to confirm that they were not engaged in any type of signals or communications with Parker, he needed a security video that provided that separate vantage point of what they were doing when they were at the back of the vehicle. That was what necessitated the review of the surveillance video. Well, he wasn't alone. He had other officers there at the scene. I mean, while he was searching the car, couldn't he have undertaken that task? Perhaps, Your Honor. But as I was saying earlier, you know, in U.S. v. Charlotte and the cases that talked about that, it's not whether the Supreme Court has a second guessing of what the steps that were occurred. And the fact that alternatives existed is not sufficient to make what happened unreasonable. It was just whether in the context of what was occurring at the time in real time, whether it was the police acted unreasonably in failing to recognize or pursue that course of action. And given the fact here where there's a, you know, multi-individual crime scene, there's finite individuals at the scene to secure the crime scene. And just to think about the time, perhaps, to think about whether or not there was a surveillance video, I don't think it was unreasonable for them to go in that order. Not only that, but I don't think there was clearly established law that would say that it was unreasonable, which is a standard that we should be dealing with here. Well, what about the further delay in looking into the immigration status of Mr. Sirleaf? It appears from the record before us that Mr. Sirleaf had identified himself and his position at the very outset. But it wasn't until an hour later that there was any follow-up as to his status. Does that qualify as due diligence? I can see, you know, the fact that that wasn't, you know, yes, Mr. Sirleaf raised that he was an alien during that initial 15-period period before the consent search, it seems like, from the record. It's not clear. But what is uncontested by the plaintiffs here is that Detective Sergeant Friedenberger was the one who engaged in that inquiry after Gregory called back on the radio from the security room of the mall saying, okay, let's let them go. Friedenberger is the one who, after they removed the handcuffs, decided to continue to question Sirleaf prior to the Joint Terrorism Task Force about his status. I can see that in your reply brief, but it doesn't appear in your opening brief. And was that argued in a district court? I believe that my colleague, Adam Gibbons, raised that during oral arguments, the fact that Gregory was not, you know, the one who was engaged in that questioning of Sirleaf. I'm not 100% aware of the record that is stated, but it is stated by Mr. Sirleaf in his testimony that at the end, there was only one detective questioning him. And that questioning began, you know, after he had been caught after Gregory had radioed to do so. So at least in the outset of when that began, it's undisputed that Detective Sergeant Friedenberger was the one who was engaged in that, and that Gregory had no individual actions involved in that process. And what about the further justification for Sirleaf's testimony about their proximity to a terrorism, a potential terrorist target, and there being a terrorism concern? That also was, I'm not seeing in your opening brief, and I wonder if that was raised in the district court, or that's simply, if that's in the record, or that's simply argumentation from counsel? Well, it is in the record that he, that Friedenberger called the Joint Terrorism Task Force, as opposed to, you know, ICE or anything like that. But no, that was not, I don't believe that that was raised below. And you're correct that I didn't mention that in the opening brief. That was only mentioned in the reply. You're correct, Your Honor. Yes. All right. Well, can I... Judge Fuente? Yeah, just a quick question. Having made the observations that were made by the officer, then I understand that he had one of the individuals that was close to the car. At the immigration status, to what extent was it necessary, given the purpose of the call, to call the FBI to confirm immigration status? You know, I don't know, Your Honor. It was something that was raised in the fact that it is, in fact, a federal crime to be without your, you know, without your documentation, if you're an alien. It's, I think, 8 USC 1304E. That's it. But, you know, beyond that, you know, I don't know. It is unrelated to the reasons why Gregory was the officer. And, like I said, you know, that doesn't appear anywhere in the record to be something that Gregory was concerned with. This was kind of something that, you know, Detective Friedenberger took upon himself. Detective Sergeant Friedenberger seems to have taken upon himself. But it certainly did contribute to the delay. The entire episode, as I see it, took an hour and a half. Is that fairly accurate? Yes, Your Honor. Roughly, yes. Okay. Thank you. All right. We'll come back to you in rebuttal. Mr. Graves. Pleased to be in the court. Gerald Graves. I'm the attorney for the appellees on Bar Salif and Stanley Somerville. The issues on the appeal is whether there is clearly established law concerning the initial stop and the scope and duration of the stop and whether the facts that frame the contours of the rights at issue are sufficiently analogous to the clearly established law. In Terry v. Ohio and its progenies, such as the Byron v. Illinois, United States v. Police, United States v. Sharp, they all set forth clearly established law for detaining persons suspected of criminality. As it relates to the initial suspicions, it's clearly established that police must have an articulable, readable suspicion of criminality to detain a person. And the objective facts concerning the conduct must raise a suspicion that is particular to the person being detained and engaged in wrongdoings. That's the police burden with respect to providing those objective facts concerning the conduct that they saw prior to their decision to make that detention. And it's clearly established in this case, it's a fact and understood the fact that Detective Gregory was the person in charge of this surveillance operation. It was not Detective Friedenberger. He was a higher level officer, but Gregory was completely in charge of this investigation. And whatever happened out there in the field was his responsibility. And that's been a finding in this particular case. Are you speaking there just as you're speaking to the third half hour? Yes, I'm speaking to that. I just wanted to add that in there as I was going through my very brief opening statement analysis just to cover that. That's a finding in the case. In fact, we took the other officers off the caption because we established that Detective Gregory was the person that made all the decisions out there. And every officer out there was very happy to testify that they had nothing to do with this. So that was very clear. It's obviously clearly established reasonable suspicion to engage in an interior staff. But when we look at clearly established law for purposes of qualified immunity, we have said time and again, as has the Supreme Court, that we have to look with specificity to the nature of the right and the context in which the case arises. And we've heard from Mr. Lynch about many of the details here that make the case certainly unique and at least arguably give rise to more suspicion than simply a case like Nevado where we said expressly that at that location, there wasn't the expectation that there was going to be a narcotics or lookouts. Here, that was absolutely the expectation. So do we really have clearly established law, a case on point that would alert an officer that this staff was unconstitutional? I believe the Supreme Court in Ybarra versus Illinois and the jurisdiction case in the United States versus Nevada fit the contours of the rights in this case that by sweeping up innocent persons only because the person is in physical proximity to another person suspected of criminality without being able to articulate objective facts particular to everyone detained would violate a person's forthcoming rights. The data was very clear when it said that you cannot transfer the suspicion from one person to another person. But I think in this case, you've got a combo of proximity with affirmative conduct that's consistent with the suspected criminal activity. And that was absent in the other cases. There wasn't affirmative conduct that was consistent with the suspected criminal activity. And so doesn't that kind of take this case at least as a matter of degree outside of those other cases? I think in Nevada, you actually had facts where Ponzo's individual had a bag that they suspected contained a gun. And Nevada simply looked into that bag. But looking into the bag could be considered suspicious. As in our case, someone behind their vehicle loading, what they were actually doing behind their vehicle, they bought items prior to coming to the mall. And they went to the mall to buy luggage. And they were consolidating the items that they purchased earlier into their luggage. Because you're in the parking lot of a huge mega mall near an airport in broad daylight with people walking by, that really should not be very suspicious to a trained officer like Detective Gregory. And when you're out there also with your first two other superior officers, that it would be unusual for a person to be behind their vehicle loading things into their car. The court in Nevada decided that it wasn't unusual for Nevada to look into the bag that they suspected had a gun. And also in Ibarra, the court decided that because Ibarra had on a large coat in March instead of a bard, that there really should not have been suspicion that he would have a gun. So I think those cases are all very, very similar in respect. May I ask you a question, Mr. Reyes? The initial observations that the officer made seem to be consistent with the type of activity that he was surveilling. In other words, the vehicle was parked right next to the car that they were looking at. And what he was seeing was the taking out of things or items from the vehicle and putting in other things. So why isn't that reasonably suspecting that they're interacting with the vehicle and the police were actually looking for it? I think that, you know, what you really have there is just a hunch that something's happened. You don't really have any objective facts of criminality. It was all innocent behavior. And it seems logical that people would do something like that on a particular day in a huge mega mall. This is a huge shopping lot, an outlet mall, where all sorts of things are happening. And there's a lot of different, you know, huge parking lots all over the mall. Any particular day, that sort of thing could be happening. So with respect to us using Ibarra and Novato, it's to basically say that you need a little bit more than a hunch to really reach that level of reasonableness in this case. It would have been more reasonable if they actually witnessed Mr. Sirleaf or Mr. Somerville, you know, doing something that maybe a lookout would do, like hand signals, pick your phone up and call, you know, something of that nature. That they were just simply doing what someone would normally do in a parking lot versus what someone would do in a lookout. I mean, again, this gets to the kind of the evolving nature of the articulated suspicion. But I mean, at one level, being across the parking lane from a potential drug dealer and moving a lot of small objects in and out of suitcases, that might not be entirely consistent with being on the lookout, but it does seem like a law enforcement officer would say, wow, that, you know, a lot of small objects, two suitcases, you know, maybe, you know, I don't think that's just hunch. I think you can say I've got a reasonable articulable suspicion that these are items that are typically used. We've got proximity as well, not the sole factor. I mean, doesn't at least that as a starting point get the officer to a reasonable articulable suspicion? And then the question after that is, well, how long do the officers have to dispel, you know, to reasonably dispel the articulable suspicion they had? And maybe they aren't doing themselves any favors by saying, well, we dispelled that on our own and then we thought it was a lookout. But if they had that initial one, like Judge Fuente suggests, they'd get some time to look at that. They might not have immediately availed themselves of that. But it does seem like there's a lot going on. What do you think? In this case, you know, Detective Gregory testified that he became suspicious as soon as he saw our clients, Somerville and Sirleaf, behind their vehicles. He assumed that Parker was coming to meet with them. And that was his initial suspicion as he was trailing right behind Parker during their surveillance. Can I ask you, Mr. Gray's man, what's wrong with having that suspicion? The suspicion, well, you know, that really fell into the area of our case that we were not able to prove because we didn't have the evidence. That's the racial profiling piece. I mean, the elephant in the room is that, you know, he kind of saw a match there. We have a black person who is a drug trafficker. He's going to a location that they didn't expect him to go to and he's trying to figure out, okay, why is he coming here? These two black guys behind a car must be going to meet them. So we're not, you know, we conceded that part of the case. We didn't have the differential analysis facts to really make that case. But that's the elephant in the room. But that's why his suspicion was unreasonable. You have somebody standing behind a car and you're looking at that conduct for less than a second as you're driving by. It's just unreasonable to believe something like that. And at the time that he saw that, Parker had not even parked near Sir Leland Somerville at that particular time. So Gregory continued up the lane and perched himself 100 yards away from what he was supposed to be surveilling. And all he ever saw from that area that he was located was when Sir Leland Somerville walked to the side of the vehicle. They couldn't see what was happening behind the vehicle. So their suspicion never was dispelled. They couldn't really see anything. All they saw at the time that that order was made to detain Mr. Parker and our clients was Mr. Parker was sitting in his car and our client was performing some innocent acts of consolidating their pharmaceutical products into their suitcases. That's all they actually saw. In the Vado, he actually looked into a bag that the detectives believe may have had a gun and they eventually realized that it was a gun. Can I just take you to the end of the story? Because I have a question about the end of the story. Because I understand that this event kind of ends with your clients being totally released from handcuffs and then totally released after about 90 minutes. And that really comes after there was a call to the Joint Terrorism Task Force that says, yeah, we have nothing. But I guess, you know, and this is a strange question, but what if the Joint Terrorism Task Force said, you know, maybe it was just due to Officer Hunch, maybe whatever, says, no, actually, you know, the plaintiffs actually might have some, you know, we're interested in them or we'd like you to continue to detain them or we've got info on them and we'd like you to bring them in. Would that, under your theory of the case, have to be suppressed because the detention was illegal and then it was prolonged? And so even if the JTTF came back with very, very positive, and I'm sorry for making that association with your clients. I know that's not what they said at all. It's hypothetical in the truest sense. But if they did, that would have to be suppressed, right? If both of these analyses do occur in that particular context where someone is trying to, you know, have evidence suppressed. And in this case, that would probably have been suppressed because the court would have found, you know, based on the test in United States v. Place and the test in United States v. Schott would have established this diligence test of some sort. They would probably have found that with respect to that time that was spent after the was then accomplished during, say, the first 30 or even the second 30 minutes of the stop. So they would have failed the diligence test in Place and Schott. Now, with respect to the initial suspicion, which was a suspicion of possible, you know, being a lookout and that sort of thing that was related to the actual suspicion that they had against Parker, this idea of some immigration issue had nothing to do with the initial suspicion. So they would have needed under Kambalas and Mena, they would have to have an independent Fourth Amendment justification to extend the stop for this new hunch they have about immigration or whatever. Terrorism was never part of the facts. I don't know how that got into the analysis. At what point in the interaction did, were the officers notified that he, Mr. Sirleaf, was there for, among other purposes, for purchasing weapons? When did he convey that to the officers in the course of this interaction? Exactly. Most of the information that could have been investigated during this 90-minute investigation they learned in the first ten minutes of the interrogation. They interrogated our client for the first ten minutes of the, during the duration of the stop, and that's when they learned of the fact that Mr. Sirleaf was the national security director of Liberia and that his stepmother was the current president of Liberia and that they were there to buy pharmaceutical products and things of that nature. He was actually there to buy tanks for his company, for his country. So they learned that during the first ten minutes of the stop. So the analysis as to who he was could have started right away. It certainly did not have to start after they had dispelled their suspicion after a 60-minute stop. Well, the officer could very well have gone in and viewed tapes and actually on those vehicles. So what is inherently wrong about viewing a surveillance tape when it just might have proved to be useful? I don't think it's reasonable because they were following Parker. They were surveilling Parker. They knew nothing about our client. They were surveilling Parker, so they knew where Parker was. They were behind him the entire time. They didn't know why our clients were there until after they stopped them and during that stop, they reviewed, they looked at what they had in their car and our clients gave them the receipts to all of the things that they had in their car, the receipts, the luggage. The receipt indicated what time they left the mall. The receipts also indicated where they were earlier in the day and what time they bought the pharmaceuticals and the cigars and things of that nature. So they knew during the first 30 minutes where everyone was located and what they were doing. To go into the surveillance booth to verify what they already knew really would be unreasonable. It would fail a diligence test. Earlier, the position that the detective had taken up did not allow him to see what was happening except to the side of the car. So with the video providing a different angle, an opportunity to see what was happening from behind the car, why wasn't it reasonable? Well, they testified that they wanted to see the videotape in order to see whether or not there was a connection between our clients and Mr. Parker. They didn't say that they were going in there to see what was happening behind the car. They could kind of deduce what was happening behind the car because they initially saw what was happening as he drove up and nothing really changed during the four minutes that all this stuff transpired in. Also, they really went to the booth because Detective First Class Peter Siano told them to go into the booth in order to make sure that they really had the right people and that there was no connection. That's when they went into the booth and realized that they had missed a hand-to-hand, what they believed was a hand-to-hand transaction that occurred with Mr. Parker and the person that he actually came there to see was a guy sitting right there in an SUV. They missed the entire transaction. Likewise, couldn't they have missed hand signals, gestures, nonverbal communication from the rear of the car that they did not have a view of from their surveillance position but would have had a view of from the surveillance camera? I think that's why the lower court, who I think did an excellent job in finding the facts in this case and analyzing the facts and was involved with this entire case and all the discovery motions, etc., it didn't fail at the 60-minute mark. It failed after the 60-minute mark with respect to whether or not the duration was unreasonable. If we were to conclude that there was reasonable suspicion for the staff at the outset, it's your position that it was reasonable in scope up to the 60-minute point? The duration of the staff? Yes. The scope of the staff up to the 60-minute point was reasonable. Are you arguing that it was only the last 30 minutes where it's clearly established as being unreasonable? I think that's the court's analysis, my analysis, based on... Every case in this circuit and all the other circuits, they pretty much use the test in place in SHARP and they analyze these cases based on the length of the stop and whether or not the stop was extended without a new Fourth Amendment justification, and then they run through the whole diligence test to see whether or not there could have been less intrusive investigative steps taken and whether or not the steps that they failed to take were unreasonable. I think there was unreasonableness in every area of this particular stop. The court broke the stop into 30-minute segments, so my personal view is that I think there was unreasonableness at the 60-minute point. Sorry, Your Honor. Mr. Gray? Yeah, no, I had an interest in your question that you were just asked, Judge Krauss just asked you a question. Basically, at what point did this search turn into from a reasonable search to an unreasonable search? Was there not a point in time when the officers had enough to investigate what they needed to investigate and that the search should have ended at that point? It was patently unreasonable once at the 60-minute mark when it's undisputed that the appellant stated that the initial suspicion was dispelled at that time. They looked at the videotape. There was no association with Parker, and they had all the other information that they received earlier. They searched the car and the receipts. So after the 60-minute period, they had dispelled their suspicion, and that's a fact in the case, that they indicated that their suspicion was dispelled at that time, but yet they continued on and reviewed this new immigration-type hunch to try and find something else to hold them on. And that typically happens in cases where the initial justification for the stop is a little weak. And we know it's weak here because of the disputed fact of Detective Gregory fabricating his police report and also coming into a deposition and continuing the fabrication. So we know that the initial stop was already very weak, and he's sitting there. He looks at that video, and he's like, oh, I missed the actual suspicion. We need to figure out something to get these guys on. We already held them here 60 minutes. So I think after the 60-minute period, it was patently unreasonable to hold them beyond that point, and that's what the court found as well. Okay. Unless there are further questions, we'll return to Mr. Lynch for rebuttal. Thank you, Your Honor. I just have a few very short things. Well, one, I kind of think... Mr. Lynch? You've cut out... Mr. Graves. It's just something I wanted to say very briefly. Is that your honor? You're cutting in and out. Okay. Can you hear me now? I think so. Let's keep trying. Okay. Okay. First, Mr. Graves raised an issue that I'm really glad he did, which is that Detective Sergeant First Class Ciano is the one who directed Gregory to go check the surveillance tape. If you look at Gregory's deposition transcript, he knew nothing about this mall, about this mall parking lot. He had never been there before. But Ciano did. Ciano was familiar, was the one who was familiar with the mall and that they had excellent surveillance, and he was the one who made the suggestion at some point to Gregory to go check the video. So, Detective Sergeant First Class Ciano being his supervisory officer at the scene, despite the fact that it was Gregory's investigation. So, that should play into the reasonableness in relation to when the order of events and when the tape was checked. Gregory had no reason to believe that there was excellent surveillance, that it would have captured the parking lot until Ciano advised him of that. Secondly... Can I ask you, at what point in time does this reflect that was communicated? I don't know that it's... It's not 100% clear from Ciano's testimony, but I believe it's happened like after the initial period of... Definitely after the initial period of when Somerville and Surly were being questioned because Ciano wasn't over there with them when that happened. So, it was beyond that. Secondly, Detective Sergeant Friedenberger... Mr. Gray said something about it was Gregory's investigation. But Detective Sergeant Friedenberger was a co-equal in rank with Gregory, and at the point that Friedenberger began his inquiry, one, Gregory wasn't even present when he began it. He was still at the security office. And two, Gregory, at that point that he dispelled that they were involved, their involvement in his investigation was over. So, I don't think that he could have told Friedenberger to not do this as a co-equal officer. And perhaps Detective Sergeant First Class Ciano or a lieutenant could have. But I don't think that you can impute that further investigation by Friedenberger to Gregory for those two reasons. And then third... Well, just let me follow up on that. What if Gregory looks at the video and says, it's negative? Release him. Right. If Gregory did that, I mean, Detective Sergeant Friedenberger would say, okay, I got an order from my co-equal. Right. The guy calling the shots on the scene says, I looked at the video. So, I mean, at one level, by Gregory not giving, I mean, by not giving the order to release, I mean, he's kind of been letting Friedenberger, yeah, I mean, maybe that's a handing off of a baton. Maybe that's a lot of other things. But I guess Gregory could have said, yeah, just let him go. It's negative. I think what Gregory did say was, you know, I confirmed they weren't involved with Parker. They are free to go. I think he added the qualifier unless there's other information that, you know, that indicates what the price is. I think he said unless there's further information based upon... So, he did that, but he also added that qualifier at the end. And they did, in fact... Sorry to interrupt, but is this just another genuine issue of material fact that would need to be worked out at trial as to their respective involvement and responsibility at that point for the further investigation? Well, it's not disputed that, you know, in Mr. Shirley's deposition transcript, he said that there was only one individual who was there and who was questioning him. And it's not disputed by plaintiffs that that individual was Detective Friedenberger. Are you asking whether there would be a dispute in fact as to whether or not Gregory had authority to do that? Is that what you're saying, Your Honor? Had authority to over Friedenberger? I'm asking if this is another disputed factual question to go forward if we were to affirm the denial of qualified immunity. I don't think it's a genuine dispute of material fact that Friedenberger was the lone one engaged in this inquiry because I think the plaintiffs conceded to that and Shirley's deposition testimony is consistent with that. Other aspects of it, perhaps. Yes. Finally, you know, Mr. Gray is relying on Nevado in relation to the case here. But just I wanted to reiterate that unlike here, Nevado's actions as looking at a gun is not consistent with criminality. It's perhaps that consistent with other actions that could have been viewed as a fact, could have been, but it's simply not, you know, a crime to observe a gun that someone else is possessing. Whereas, you know, it is one to act as a lookout for someone engaged in drug trafficking, which was what the suspicion in relation to Summerville and Sirleaf was here. And if you have no further questions, I see whatever's the rest of my time. Okay. Thank you, Mr. Lynch, Mr. Graves. Thank you. And for working through with us all the technical issues of the day. Thank you. Thank you. Thank you. Thank you. Thank you.